IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| HOLLY MARIE WALZ, | ) Case No. 1:18-cv-1375 |
| | ) |
| Plaintiff, | ) |
| | ) MAGISTRATE JUDGE |
| v. | ) THOMAS M. PARKER |
| | ) |
| COMMISSIONER OF | ) |
| SOCIAL SECURITY, | ) **MEMORANDUM OF OPINION** |
| | ) **AND ORDER** |
| Defendant. | ) |

**I.     Introduction**

Plaintiff, Holly Marie Walz, seeks judicial review of the final decision of the Commissioner of Social Security, denying her application for disability insurance benefits ("DIB") under Title II of the Social Security Act. This matter is before me pursuant to 42 U.S.C. § 405(g) and the parties consented to my jurisdiction under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73. ECF Doc. 12. Because the Administrative Law Judge ("ALJ") failed to apply proper legal standards in evaluating treating psychiatrist Dr. Samer Alamir's September 2017 opinion, the Commissioner's final decision denying Walz's application for DIB must be VACATED and the matter REMANDED for further proceedings consistent with this memorandum of opinion and order.

## II. Procedural History

On January 19, 2016, Walz applied for DIB. (Tr. 153-54).[1] Walz alleged that she became disabled on October 31, 2013, due to "panic and anxiety disorder, depression, migraines, extreme panic attacks, agoraphobia, [and] lower back problems." (Tr. 57-58, 153). The Social Security Administration denied Walz's applications initially and upon reconsideration. (Tr. 57-87). Walz requested an administrative hearing. (Tr. 107-08). ALJ Eric Westley heard Walz's case on October 19, 2017, and denied the claim in a November 24, 2017, decision. (Tr. 8-56). On May 5, 2018, the Appeals Council denied further review, rendering the ALJ's decision the final decision of the Commissioner. (Tr. 1-5). On June 18, 2018, Walz filed a complaint to seek judicial review of the Commissioner's decision. ECF Doc. 1.

## III. Evidence

### A. Personal, Educational and Vocational Evidence

Walz was born on December 19, 1989, and she was 23 years old on the alleged onset date. (Tr. 153). Walz had a bachelor's degree in early childhood education. (Tr. 33). She had prior work experience at a dollar store and clothing store; however, the ALJ determined that she had no past relevant work. (Tr. 21, 34-35).

### B. Relevant Medical Evidence

On January 6, 2013, Walz went to the emergency department for panic attacks, due to Klonopin withdrawal. (Tr. 277). Walz told David Levine, MD, that she took Klonopin regularly to control her anxiety symptoms. (Tr. 277). On examination, Dr. Levine noted that Walz's mood, affect, and behavior were normal. (Tr. 278). Dr. Levine diagnosed Walz with benzodiazepine withdrawal, gave her medications, and found that she was stable. (Tr. 278-79).

---

[1] The administrative transcript is in ECF Doc. 10.

On March 22, 2013, Walz returned to the emergency department with anxiety, hallucinations, chills, and nausea after her psychiatrist changed her medications. (Tr. 290). On examination, Richard Nelson, MD, noted that Walz had hallucinations, confusion, and decreased concentration; however, her mood, affect, behavior, and thought content were normal. (Tr. 291-92). Dr. Nelson stated that Walz "markedly improved" after he gave her Ativan. (Tr. 292).

On March 4, 2015, Walz established care with Psychiatrist Samer Alamir, MD. (Tr. 235-38, 365-68). Dr. Alamir noted that Walz was on Effexor, Neurontin, Xanax, and Propranolol, and that she was previously diagnosed with generalized anxiety disorder and panic disorder with agoraphobia. (Tr. 235, 365). Walz told Dr. Alamir that she had daily panic attacks, which were triggered by being alone outside the home, being in a crowd, traveling in a vehicle, and having intense fear or discomfort. (Tr. 235, 365). She said her panic attacks caused palpitations, pounding heart, fast heart rate, nausea, abdominal distress, trembling, shaking, sweating, shortness of breath, sensations of smothering, dizziness, fear of dying, paresthesias, and hot flashes. (Tr. 235, 365). Walz said that she "shut[] herself away from the world[,] . . . lock[ed] herself in the house[,] and . . . avoid[ed] going places." (Tr. 235, 365). Walz also said that she was depressed because she could not work, enjoyed activities and hobbies less, had difficulty concentrating, and had less energy. (Tr. 235, 365). On examination, Dr. Alamir determined that Walz was attentive, was fully communicative, spoke normally, had intact and logical associations and thought content, had intact cognitive functioning and memory, and did not have any hyperactive or attentional difficulties. (Tr. 237, 367). Walz appeared unhappy, and had signs of severe anxiety. (Tr. 235, 237, 365, 367). Dr. Alamir diagnosed Walz with panic disorder, severe major depressive disorder, and agoraphobia. (Tr. 238). He continued Walz's

3

medications, decreased her Effexor dose, and added a Paxil prescription for her depression. (Tr. 238, 368).

Between April 2015 and July 2015, Walz's anxiety and depression symptoms generally improved. (Tr. 232-34, 362-64). On April 22, 2015, Walz told Dr. Alamir that her panic attacks had gotten a little better, and that she was able to get outside more. (Tr. 234, 364). Dr. Alamir noted that she was attentive, communicative, and had no thought or attention issues. (Tr. 234, 364). Nevertheless, Walz continued to exhibit depression and a sad demeanor, which was exacerbated by her grandfather's death. (Tr. 234, 364). On May 27, 2015, Walz told Dr. Alamir that she felt "ok at times and other times fe[lt] really good," and Dr. Alamir noted that Walz's anxiety was "mild." (Tr. 233, 363). On July 7, 2015, Walz told Dr. Alamir that she was "doing pretty good with her mood," and her daily panic attacks were not as frequent or intense as they were in the past. (Tr. 232, 362).

From October 2015 and June 2016, Walz generally reported to Dr. Alamir that she had increased anxiety. (Tr. 231, 322, 360-61). On examination in October 2015 and February 2016, Dr. Alamir noted that Walz had high anxiety, but he did not note any other significant changes in her condition or treatment. (Tr. 231, 322, 360-61). On October 6, 2015, Dr. Alamir also noted that Walz was compliant with her medications and functioned well, notwithstanding her increased anxiety. (Tr. 231, 361). On April 12, 2016, Walz saw Dr. Alamir for an "urgent appointment" after discovering she was pregnant and sought to have her Xanax dose reduced. (Tr. 321, 359). Walz said that she had "mild anxiety," felt happy, believed that her medication was working, and believed that she had a panic attack the day before her appointment due to withdrawal. (Tr. 321, 359). On examination, Dr. Alamir noted that Walz had "mild to moderate signs of anxiety." (Tr. 321, 359). On June 15, 2016, Walz told Dr. Alamir that she had severe

anxiety, worried excessively, and had difficulty sleeping. (Tr. 358). Dr. Alamir continued to decrease Walz's Xanax and started a Seroquel prescription. (Tr. 358).

From July 2016 through July 2017, Walz's anxiety symptoms generally improved. (Tr. 350-57). On July 15, 2016, Walz told Dr. Alamir that she could not stop taking Xanax because her anxiety increased, even though she understood Xanax involved risks to her pregnancy. (Tr. 357). Walz also said that she went on walks, and Dr. Alamir noted that her anxiety was "mild." (Tr. 357). On August 16, 2016, and November 22, 2016, Dr. Alamir noted that Walz's anxiety was mild, and on September 22, 2016, Walz had "no apparent signs of anxiety." (Tr. 355). Walz reported increased anxiety and more frequent panic attacks in January and February 2017, and Dr. Alamir increased her Xanax dosage. (Tr. 352-53). On May 19, 2017, Walz said that she felt stable, did not describe any anxiety symptoms, and denied any mood disturbances or depression. (Tr. 351). On May 19 and July 25, 2017, Dr. Alamir noted that there were "no signs of anxiety" on examination, and that her symptoms were well-managed. (Tr. 350-51).

    **C.    Relevant Opinion Evidence**

        **1.    Treating Psychiatrist – Samer Alamir, MD**

On October 7, 2015, Dr. Alamir wrote a letter, stating: "The above referenced patient is under my care and treatment. Ms. Walz is unable to work 20 hours per week due to anxiety and panic attacks." (Tr. 243).

On September 27, 2017, Dr. Alamir completed a "medical impairment questionnaire." (Tr. 342-43). Dr. Alamir noted that Walz was diagnosed with panic disorder, severe major depressive disorder, and agoraphobia, and that her prognosis was "fair." (Tr. 342). Dr. Alamir opined that Walz had an "unlimited or very good" ability to ask simple questions, request assistance, be aware of normal hazards, and take appropriate precautions. (Tr. 342-43). He

5

stated that Walz had a "limited but satisfactory" ability to carry out very short and simple instructions, maintain socially appropriate behavior, and adhere to basic standards of neatness and cleanliness. (Tr. 342-43). He stated that Walz had a "seriously limited, but not precluded" ability to manage regular attendance, be punctual within customary tolerances, perform at a consistent pace without an unreasonable number and length of rest periods, interact appropriately with the general public, accept instructions, and respond appropriately to supervisor criticism. (Tr. 342-43). Dr. Alamir stated that Walz was "unable to meet competitive standards" with her ability to carry out detailed instructions, maintain attention and concentration for extended periods, sustain an ordinary routine without special supervision, work in coordination with or in proximity to others without being distracted by them, get along with coworkers or peers without distracting them or exhibiting behavioral extremes, respond appropriately to changes in the work setting, and set realistic goals or make plans independently of others. (Tr. 342-43). Dr. Alamir stated that Walz had "no useful ability to" complete a normal workday and workweek without interruption from psychologically based symptoms. (Tr. 342). Dr. Alamir also said that Walz was "unable to work." (Tr. 343).

### 2. Consultative Examiner—Richard Davis, MA

On March 8, 2016, Richard Davis, MA, examined Walz and completed a psychological report. (Tr. 316-20). During the examination, Walz told Davis that she had panic attacks and agoraphobia. (Tr. 316). She said that she stopped going to work in 2013, due to increased anxiety attacks and had anxiety attacks during subsequent interviews. (Tr. 316). She said that she rarely left the house, napped in the afternoon, did not cook, cleaned dishes, did laundry, cleaned the house, read, watched television, had no friends, and rarely attended religious services. (Tr. 318). Walz said that she stopped driving after she had an anxiety attack while driving. (Tr. 318).

6

On examination, Davis noted that Walz was cooperative, not eccentric, and not impulsive or compulsive. (Tr. 318). Walz said she had four to five anxiety attacks each day, which lasted from one minute to two hours. (Tr. 318). Davis noted that Walz was preoccupied with things that happened to her, blamed other people for her problems, and had no delusions or hallucinations. (Tr. 318-19). Walz understood all of Davis's questions, was able to recall seven digits forward and five in reverse, and had some limitations in thinking logically, using common sense, judgment, and responding appropriately. (Tr. 319). Davis stated that Walz paid attention and concentrated, did not indicate that she had trouble getting along with supervisors or fellow workers in employment situations, and could deal with workplace stress and pressure once she got to work. (Tr. 319).

### 3. State Agency Psychiatrists

On March 21, 2016, state agency psychiatrist Kathleen Mallory, Ph.D., evaluated Walz's mental function based on a review of the medical record. (Tr. 64-68). Dr. Mallory determined that Walz had mild restrictions to her daily living activities, mild difficulties with social functioning, and moderate difficulties in maintaining concentration, persistence, and pace. (Tr. 65). She determined that Walz did not have any limitations in understanding, memory, carrying out short and simple instructions, sustaining an ordinary routine without special supervision, working in coordination with or in proximity to others without being distracted by them, making simple work-related decisions, asking simple questions, requesting assistance, accepting instructions, responding appropriately to supervisor criticism, getting along with coworkers or peers without distracting them or exhibiting behavioral extremes, maintaining socially appropriate behavior, adhering to basic standards of neatness and cleanliness, being aware of normal hazards, taking appropriate precautions, traveling in unfamiliar places, using public transportation, setting realistic goals, and making independent plans. (Tr. 67-68). Walz

7

was moderately limited in her ability to carry out detailed instructions, maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance, be punctual within customary tolerances, complete a normal workday and workweek without interruptions for psychologically based symptoms, perform at a consistent pace without an unreasonable number and length of rest periods, interact appropriately with the general public, and respond appropriately to changes in the work setting. (Tr. 67-68). Dr. Mallory also noted that, notwithstanding Walz's reports of severe agoraphobia and panic attacks, she was friendly, communicative, was able to use public transportation, and reported trying to conceive with her boyfriend. (Tr. 68). On August 4, 2016, Bruce Goldsmith, Ph.D., concurred with Dr. Mallory's opinion. (Tr. 80-83).

### D. Relevant Testimonial Evidence

Walz testified at the ALJ hearing. (Tr. 32-49). Walz testified that she lived in the first-floor unit of her father's house with her fiancé and daughter, and that her mother lived in the upstairs unit. (Tr. 33). She did not work. (Tr. 33-34). Walz said that she had panic attacks any time she went to job interviews and could not leave the house without a family member. (Tr. 37). Her fiancé did most of the grocery shopping, and she accompanied him only "once in a while" but would wait in the car if it was crowded. (Tr. 37-38, 48). She "freak[ed] out" when she tried to drive and when she was in public with a lot of people. (Tr. 38). Walz took care of her daughter, with help from her fiancé, mom, and dad. (Tr. 40). Walz said that she self-isolated once a week, and she would go to her room to collect herself and calm down. (Tr. 47).

Walz testified that she last worked in 2013 as a cashier at a dollar store and a clothing store. (Tr. 34, 37). She stated that she quit her dollar store and clothing store jobs because her "anxiety was too bad," and she would freak out while driving to work. (Tr. 35). She was let go because she did not show up to work. (Tr. 35). Walz also did paperwork for one of her dad's

8

businesses "once in a while," but said she was not paid. (Tr. 36). Walz also worked as a part time nail tech during college and at a grocery store during high school. (Tr. 37).

Walz testified that her panic attacks occurred daily and lasted from five minutes to a couple hours. (Tr. 39, 41). She said they started off as a wave of heat, then she felt like she could not breathe, and finally she felt like she was going to pass out. (Tr. 38). She said that she hyperventilated, cried, and thought she was going to die. (Tr. 38-39). Walz took medication for her panic attacks and anxiety, and she took the maximum dose she could take in a day. (Tr. 39-40). Walz said that when she felt like she was having a panic attack, she told herself that it would pass, tried to regulate her breathing, meditated, closed her eyes, and tried to think happy or calm thoughts. (Tr. 39-40). Walz said that she last had a panic attack right before she went to the hearing. (Tr. 41). Walz also stated that she tried counseling, but that the counselor tried switching her medication too often and it "almost killed [her]." (Tr. 42). Walz said that her medications caused her to forget things, made her fall asleep often, and made concentrating on homework difficult. (Tr. 46-47).

Robert Mosley, a vocational expert ("VE"), also testified at the hearing. (Tr. 49-53). The ALJ directed the VE whether a hypothetical individual could work if she could do work at all exertional levels, except that she "can perform simple, repetitive tasks in a setting with occasional minor changes; can perform goal-oriented work, but could not work at a production-rate pace and cannot interact with the public." (Tr. 50-51). The VE testified that such an individual could work as a cleaner/housekeeper, assembler of plastic hospital products, and inspector and hand packager. (Tr. 51). The VE testified that if a hypothetical individual could not work if she would be off task 20 percent of the time, or if she would be absent two times per month on an ongoing basis. (Tr. 52-53).

## IV. The ALJ's Decision

The ALJ's November 24, 2017, decision found that Walz was not disabled and denied her application for DIB. (Tr. 11-22). The ALJ found that Walz had not engaged in substantial gainful activity since October 31, 2013, and had the severe impairments of: panic disorder, major depressive disorder, and agoraphobia. (Tr. 13). The ALJ determined that Walz had no impairment or combination of impairments that met or medically equaled the severity of any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 14-15). The ALJ determined that Walz had the RFC to perform work at all exertional levels, except that: "[s]he can perform simple, repetitive tasks in a setting with occasional minor changes; [s]he can perform goal-oriented work, but she cannot work at a production rate pace; [and s]he cannot interact with the public." (Tr. 16). In assessing Walz's RFC, the ALJ explicitly stated that he "considered all symptoms" in light of the medical and other evidence in the record. (Tr. 16). The ALJ specifically noted that Walz's mental impairments – including agoraphobia – caused only moderate limitations, were adequately controlled through medication, and did not prevent her from leaving her house. (Tr. 16-21).

The ALJ gave "partial weight" to the state agency psychologists' opinions – that Walz had only mild daily living and social functioning limitations, and moderate limitations in concentration, persistence, and pace – because Walz's need for medication indicated that she had moderate functional limitations. (Tr. 19). The ALJ gave Dr. Alamir's October 7, 2015, opinion "little weight" because it was not consistent with the record as a whole or his own treatment notes. (Tr. 19). Further, the ALJ stated that Dr. Alamir's September 27, 2017, opinion was "inconsistent with the mental health assessment he [had] completed," and that he "interpret[ed] the assessment that the claimant is moderately functionally limited and consistent with the mental residual functional capacity." (Tr. 19-20). The ALJ also stated that Dr. Alamir's

statement – that Walz was "unemployable" – was an opinion on a matter reserved for the Commissioner. (Tr. 20).

Because the ALJ found that Walz had nonexertional limitations that reduced her ability to perform the full range of work at all exertional levels, he relied on the VE's testimony to determine whether Walz could work. (Tr. 21). Based on the VE's testimony, the ALJ found that Walz could work as a housekeeper cleaner, assembler of plastic hospital products, and inspector and hand packager. (Tr. 21). In light of his findings, the ALJ determined that Walz was not disabled from October 31, 2013, through the date of his decision and denied Walz's application for DIB. (Tr. 21-22).

## V. Law & Analysis

### A. Standard of Review

The court's reviews the Commissioner's final decision to determine whether it was supported by substantial evidence and whether proper legal standards were applied. 42 U.S.C. § 405(g); *Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003). Substantial evidence is any relevant evidence, greater than a scintilla, that a reasonable person would accept as adequate to support a conclusion. *Rodgers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).

Under this standard, the court does not decide the facts anew, evaluate credibility, or re-weigh the evidence. *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003). If supported by substantial evidence and reasonably drawn from the record, the Commissioner's factual findings are conclusive – even if this court would reach a different conclusion or evidence could have supported a different conclusion. 42 U.S.C. §§ 405(g); *see also Elam*, 348 F.3d at 125 ("The decision must be affirmed if . . . supported by substantial evidence, even if that evidence could support a contrary decision."); *Rogers*, 486 F.3d at 241 ("[I]t is not necessary that

11

this court agree with the Commissioner's finding, as long as it is substantially supported in the record."). This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without being second-guessed by a court. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Even if supported by substantial evidence, however, the court will not uphold the Commissioner's decision when the Commissioner failed to apply proper legal standards, unless the error was harmless. *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own regulations and [when] that error prejudices a claimant on the merits or deprives the claimant of a substantial right."); *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) ("Generally, . . . we review decisions of administrative agencies for harmless error."). Furthermore, the court will not uphold a decision, when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Charter*, 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue,* No. 1:10-CV-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue,* No. 2:10-CV-017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-CV-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D. Ohio July 9, 2010). Requiring an accurate and logical bridge ensures that a claimant will understand the ALJ's reasoning.

The Social Security regulations outline a five-step process the ALJ must use to determine whether a claimant is entitled to benefits: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of

impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) if not, whether the claimant can perform her past relevant work in light of her RFC; and (5) if not, whether, based on the claimant's age, education, and work experience, she can perform other work found in the national economy. 20 C.F.R. § 404.1520(a)(4)(i)–(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642–43 (6th Cir. 2006). The claimant bears the ultimate burden to produce sufficient evidence to prove that she is disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a).

### B. Parties' Arguments

Walz argues that the ALJ failed to apply proper legal procedures and reach a decision supported by substantial evidence in evaluating Dr. Alamir's opinion. ECF Doc. 13 at 12-18. Specifically, Walz asserts that the ALJ erred by failing to discuss the regulatory factors in evaluating Dr. Alamir's opinion, and that the regulatory factors would have favored giving Dr. Alamir's opinion great weight. *Id.* at 14-15. She also contends that the ALJ's reasons for rejecting Dr. Alamir's opinion – that it was inconsistent with the record as a whole and his own treatment notes – were not good reasons, because Dr. Alamir's opinion was consistent with other evidence in the record and the ALJ improperly played doctor by evaluating the consistency between Dr. Alamir's opinion and his own treatment notes. *Id.* at 15-18. Further, Walz argues that a preponderance of the evidence supported Dr. Alamir's opinion, and that the ALJ should have at least acknowledged that Dr. Alamir's opinion was consistent with the state agency consultant's opinions. *Id.* at 17-18. Walz also contends that the ALJ erred by failing to incorporate in to the RFC any limitations based on her agoraphobia, because the ALJ's Step Two finding that her agoraphobia was a severe impairment required the ALJ to find that it caused a functional limitation. *Id.* at 18-19.

The Commissioner responds that the ALJ properly evaluated Dr. Alamir's opinion in light of the record as a whole and gave good reasons for giving it "little weight." ECF Doc. 15 at 7-8. The Commissioner argues that the ALJ was not required to give any weight to, or give good reasons for rejecting, Dr. Alamir's October 2015 and September 2017 statements that Walz was "unable to work," because that is an issue reserved to the Commissioner. *Id.* Further, the Commissioner asserts that the ALJ's reasons for rejecting the functional limitations in Dr. Alamir's September 2017 opinion – that it was inconsistent with his own mental health assessments and Walz's statements that her medications helped – were adequate. *Id.* at 8. Furthermore, the Commissioner asserts that the state agency consultants' opinions supported the ALJ's ultimate RFC and disability finding. *Id.* at 8-9.

### C. Treating Physician Opinion

At Step Four, an ALJ must weigh every medical opinion that the Social Security Administration receives. 20 C.F.R. § 404.1527(c). An ALJ must give a treating physician's opinion controlling weight, unless the ALJ articulates good reasons for discrediting that opinion. *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013). "Treating-source opinions must be given 'controlling weight' if two conditions are met: (1) the opinion is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques'; and (2) the opinion 'is not inconsistent with the other substantial evidence in [the] case record.'" *Id.* (quoting 20 C.F.R. § 404.1527(c)(2)). Good reasons for rejecting a treating physician's opinion may include that: "(1) [the] treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) [the] treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." *See Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1179 (11th Cir. 2011) (quotation omitted); 20 C.F.R. § 404.1527(c). Inconsistency with nontreating or nonexamining physicians' opinions alone is not a good reason for rejecting a

14

treating physician's opinion. *See Gayheart*, 710 F.3d at 377 (stating that the treating physician rule would have no practical force if nontreating or nonexamining physicians' opinions were sufficient to reject a treating physician's opinion).

If an ALJ does not give a treating physician's opinion controlling weight, he must determine the weight it is due by considering the length of the length and frequency of treatment, the supportability of the opinion, the consistency of the opinion with the record as a whole, and whether the treating physician is a specialist. *See Gayheart*, 710 F.3d at 376; 20 C.F.R. § 404.1527(c)(2)–(6). Nothing in the regulations requires the ALJ to explain how he considered each of the factors. *See* 20 C.F.R. § 404.1527(c). Nevertheless, the ALJ must provide an explanation "sufficiently specific to make clear to any subsequent reviewers the weight the [ALJ] gave to the treating source's medical opinion and the reasons for that weight." *Gayheart*, 710 F.3d at 376; *see also Cole v. Astrue*, 661 F.3d 931, 938 (6th Cir. 2011) ("In addition to balancing the factors to determine what weight to give a treating source opinion denied controlling weight, the agency specifically requires the ALJ to give good reasons for the weight he actually assigned."). When the ALJ fails to adequately explain the weight given to a treating physician's opinion, or otherwise fails to provide good reasons for rejecting a treating physician's opinion, remand is appropriate. *Cole*, 661 F.3d at 939.

Notwithstanding the requirement that an ALJ consider and weigh medical opinion evidence, the ALJ is not required to give any deference to opinions on issues reserved to the Commissioner. 20 C.F.R. § 404.1527(d). These issues include: (1) whether a claimant has an impairment or combination of impairments that meets or medically equal an impairment in the Listing of Impairments; (2) the claimant's RFC; (3) the application of vocational factors; and (4) whether a claimant is "disabled" or "unable to work." 20 C.F.R. § 404.1527(d)(1)–(2).

The ALJ failed to apply proper legal standards in evaluating Dr. Alamir's September 2017 opinion. The ALJ properly stated that Dr. Alamir's October 2015 and September 2017 statements – that Walz was unable to work – were due little weight and was not required to give good reasons for giving those statements little weight, because those statements were opinions on a matter reserved to the Commissioner. 20 C.F.R. § 404.1527(d); (Tr. 19-20, 243, 343). Nevertheless, the ALJ failed to comply with the regulations when he did not explain what weight he gave Dr. Alamir's September 2017 functional assessments. *Gayheart*, 710 F.3d at 376; 20 C.F.R. § 404.1527(c)(2)–(6); (Tr. 19-20). Here, the ALJ's statements – that Dr. Alamir's functional assessments were inconsistent with his own treatment notes and that Dr. Alamir's functional assessments were consistent with the RFC finding – were insufficient to apprise a reviewing court of whether he gave Dr. Alamir's opinion little, partial, or great weight in determining Walz's RFC. *Gayheart*, 710 F.3d at 376; *Cole*, 661 F.3d at 938; (Tr. 19-20). Thus, the ALJ failed to apply proper legal standards in evaluating Dr. Alamir's September 2017 opinion. This error was not harmless. Had Dr. Alamir's opinions been accepted, Walz's DIB application would have been approvable given the other evidence in the record.

### D. RFC Determination

At Step Two of the sequential analysis, the ALJ considers whether the claimant has a "severe impairment." 20 C.F.R. §§ 404.1520(a)(4)(ii), (c), 416.920(a)(4)(ii), (c). An ALJ's Step Two determination that a claimant has a severe impairment is merely a threshold determination. *See Nejat v. Comm'r of Soc. Sec.*, 359 F. App'x 574, 576 (6th Cir. 2009) (stating that Step two is "intended to 'screen out totally groundless claims'") (quoting *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 89 (6th Cir. 1985)). So long as the claimant's medically determinable impairment would be expected to cause more than a minimal effect on her ability to work, the ALJ must find that the impairment is severe. *See Brady v. Heckler*, 724 F.2d 914, 920 (11th Cir.

16

1984) ("An impairment can be considered as not severe only if it is a slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work."); SSR 96-3p, 61 Fed. Reg. 34468, 34470 (Jul. 2, 1996) ("If the [ALJ] finds that [the claimant's] symptoms cause a limitation or restriction having more than a minimal effect on an individual's ability to do basic work activities, the [ALJ] must find that the impairment[] is severe and proceed to the next step in the process even if the objective medical evidence would not in itself establish that the impairment[] is severe."). Nevertheless, that determination is not, in itself, a determination regarding the character or extent of functional limitations that might have been caused by those impairments. *Cf.* SSR 96-8p, 61 Fed. Reg. 34474, 34477 (Jul. 2, 1996) (stating that "[m]edical impairments and symptoms . . . are not intrinsically exertional or nonexertional," and that the ALJ must determine the extent to which the claimant's impairments "*may* cause physical or mental restrictions that *may* affect his or her capacity to do work-related physical and mental activities." (emphasis added)). Instead, a severe impairment finding requires only that the ALJ proceed in the sequential evaluation process and consider all of the claimant's impairments – severe or otherwise – in assessing her RFC. *See Nejat*, 359 F. App'x at 577 ("After an ALJ makes a finding of severity as to even one impairment, the ALJ 'must consider limitations and restrictions imposed by *all* of an individual's impairments, even those that are not 'severe.'"); SSR 96-3p, 61 Fed. Reg. at 34470; SSR 96-8p, 61 Fed. Reg. at 34477.

At Step Four of the sequential analysis, the ALJ must determine a claimant's RFC by considering all relevant medical and other evidence. 20 C.F.R. § 404.1520(e). The RFC is an assessment of a claimant's ability to do work despite his impairments. *Walton v. Astrue*, 773 F. Supp. 2d 742, 747 (N.D. Ohio 2011) (citing 20 C.F.R. § 404.1545(a)(1) and SSR 96-8p, 61 Fed. Reg. at 34475). "In assessing RFC, the [ALJ] must consider limitations and restrictions imposed

17

by *all* of an individual's impairments, even those that are not 'severe.'" SSR 96-8p, 61 Fed. Reg. at 34477. Relevant evidence includes a claimant's medical history, medical signs, laboratory findings, and statements about how the symptoms affect the claimant. 20 C.F.R. § 404.1529(a).

The ALJ applied proper legal standards and reached a decision supported by substantial evidence in declining to include in Walz's RFC additional limitations based on her agoraphobia. Here, the ALJ's threshold finding that Walz's agoraphobia was a severe impairment at Step Two did not require the ALJ to find that Walz had functional limitations due to her agoraphobia at Step Four. *Nejat*, 359 F. App'x at 576; *Farris*, 773 F.2d at 89; *Brady*, 724 F.2d at 920; SSR 96-3p, 61 Fed. Reg. at 34470; SSR 96-8p, 61 Fed. Reg. at 34477. Instead, the ALJ was merely required to proceed in the sequential evaluation and consider all of Walz's impairments in light of the medical and other evidence. 20 C.F.R. § 404.1520(e); SSR 96-8p, 61 Fed. Reg. at 34477. The ALJ complied with that requirement when he "considered all symptoms" in light of the medical and other evidence, and explained that Walz's mental impairments – including her agoraphobia – caused only moderate limitations, were adequately controlled through medication, and did not prevent her from leaving her house. (Tr. 16-21). Substantial evidence also supported the ALJ's decision not to assess additional limitations based on Walz's agoraphobia, including: (1) her own statements about being able to take walks and go grocery shopping with her fiancé; (2) Dr. Alamir's, Dr. Levine's, and Dr. Nelson's notes indicating that Walz's symptoms were adequately controlled with medication; (3) Dr. Alamir's notes indicating that Walz's anxiety/panic disorder was mild to moderate and improved over the course of treatment; (4) Dr. Alamir's opinion that Walz could maintain socially appropriate behavior, and (5) examining psychologist Davis's notes, indicating that Walz was cooperative, able to pay attention and concentrate, did not indicate difficulty getting along with supervisors or coworkers, and could deal with workplace stress and pressure once she got to work. (Tr. 37-38, 48, 232-34,

278-79, 292, 318-19, 321, 342-43, 350-57, 359, 362-64). Accordingly, the ALJ applied proper legal standards in declining to include in Walz's RFC additional limitations based on her agoraphobia. However, this conclusion may change upon a proper evaluation of Dr. Alamir's opinion. Upon remand, the Commissioner should determine whether changes in Walz's RFC are warranted after a proper evaluation of the treating source opinion is conducted.

## VI. Conclusion

Because the ALJ failed to apply proper legal standards in evaluating treating psychiatrist Dr. Alamir's September 2017 opinion, the Commissioner's final decision denying Walz's application for DIB must be VACATED and the matter REMANDED for further proceedings consistent with this memorandum of opinion and order.

**IT IS SO ORDERED.**

Dated: May 6, 2019

Thomas M. Parker
United States Magistrate Judge